UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 16-cr-10137-LTS |
| KENNETH BRISSETTE and TIMOTHY SULLIVAN | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Defendants Kenneth Brissette ("Mr. Brissette") and Timothy Sullivan ("Mr. Sullivan") (collectively, "defendants") have been charged in a Superseding Indictment, alleging that they conspired to extort and extorted Company A in violation of the Hobbs Act. The crime of extortion typically involves a defendant who threatens to cause harm to another unless that person gives the defendant something of value, usually money. Here, Counts 1 and 2 purport to charge the defendants with wrongfully using Company A's fear of economic harm to extort money from it in the form of wages to be paid to a third party. But the Superseding Indictment does not allege facts showing that either defendant threatened – explicitly or implicitly – to do anything to Company A, that either defendant sought or received any money from Company A, or that Company A's owners were in fact fearful that either defendant would cause harm to their company.

These critical allegations are missing from the Superseding Indictment because – as the government knows – there are no facts to support them. And without such allegations, the Superseding Indictment fails as a matter of law. For the reasons set forth below, the Court should reject the government's efforts to expand the potential reach of the Hobbs Act beyond

both the plain language of the statute and established case law, and dismiss this case against both defendants.

## RELEVANT BACKGROUND

The Superseding Indictment alleges that Mr. Sullivan was hired by the City of Boston in or about January 2014 as the Chief of Staff for Intergovernmental Relations/Senior Advisor for External Relations, and Mr. Brissette was hired in or about May 2014 in a separate department as the Director of the Office of Tourism, Sports and Entertainment. See Sup. Ind. ¶¶ 1-2. Between May 1, 2014 and September 30, 2014, the defendants are alleged to have violated the Hobbs Act, 18 U.S.C. § 1951, by agreeing to "obtain property of Company A, a production company for a music festival, to wit: money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services[,] and wages and benefits to be paid pursuant to a labor contract with Local 11, with the consent of Company A." *Id.* at ¶¶ 20, 21 (emphasis added).[1] The Superseding Indictment further alleges that Company A's consent was "induced by the wrongful use of fear of economic harm to Company A and others . . . ." *Id.* Count One of the Superseding Indictment charges the defendants with conspiring to violate the Hobbs Act, and Count Two charges them with a substantive Hobbs Act violation. *Id.*

Following the defendants' Joint Motion for a Bill of Particulars as to the property alleged to be at issue and the wrongful conduct in which they allegedly engaged (dkt #52), the Superseding Indictment's allegations gained more flesh. First, during oral argument on the defendants' motions, the government confirmed that the property at issue consists solely of the wages and benefits that Company A paid to nine union workers for three days of work in

[1] The Superseding Indictment contains two paragraphs numbered "20," one that appears on page 6 and one that appears on page 7. Unless otherwise noted, all references to paragraph 20 in this Memorandum refer to the paragraph appearing on page 6.

September 2014. *See* Order on Defendants' Joint Motion for Bill of Particulars (dkt #65) at 8.[2] None of those wages or benefits is alleged to have been paid directly or indirectly to the defendants.

Next, in response to the Court's Order on defendants' motion, the government produced a bill of particulars in the form of a letter setting forth the "substance of the alleged conversations" on which the Superseding Indictment was based. *See* **Exhibit A** (10/31/16 letter) at 1-2, ¶ 4 ("Bill of Particulars"). Notably and contrary to multiple press reports about this case, the Bill of Particulars did not allege that the defendants threatened to withhold permits from Company A unless the company hired union workers; indeed, defendants are not alleged to have mentioned permits at all. Rather, the Bill of Particulars alleges in its entirety that:

> The defendants, who were careful choosing the words they used, either explicitly stated or intimated that they wanted Crash Line Productions to hire members of [Local 11] for the September Boston Calling event. The defendants stated that [Local 11] was unhappy that they were not part of the Boston Calling Festival. Crash Line Productions made clear to the defendants that they already had a contract with Bill Kenney Productions and were happy with the labor they had hired. The defendants conveyed that if [Local 11] was not hired, they [Local 11] would picket and come with the blow up rat, which would be a problem for both Crash Line and the mayor. Crash Line told the defendants they would have to fire people to take on members of [Local 11]. The defendants stated that everyone had to get a fair shake and a shot at working this event. They further stated that the mayor has a background in working with unions and wanted to find a way to bring everyone to the table to get everyone working together. The defendants told Crash Line that half of their crew had to be [Local 11] members. Crash Line told the defendants that hiring that amount of [Local 11] members would cripple them financially. An agreement was negotiated between the defendants and Crash Line to hire eight [Local 11] members.

*Id.*

Finally, the Bill of Particulars incorporated a list of meetings that identified "the participants in the conversations during which the government contends the wrongful conduct took place." *See* Order (dkt #65) at 9, ¶¶ 2-3; Exhibit A at 1, ¶¶ 2-3; **Exhibit B** (10/18/16 letter), at 1, ¶ 2. Company A's principals, identified by the government as Michael Snow and Brian

[2] The government does not allege that Local 11 or any of its members are co-conspirators in this case.

Appel, are alleged to have attended one meeting with the defendants on September 2, 2014; Mr. Appel is also alleged to have spoken or met with one or both defendants without Mr. Snow on three occasions prior to the September 2014 event at issue in this case and on two occasions following it. *See* Exhibit A at 1, ¶¶ 2-3; Exhibit B at 1, ¶ 2 & attached list. The Bill of Particulars did not allege that either of Company A's principals believed or feared that Mr. Brissette or Mr. Sullivan intended to or would cause their company any harm. That is consistent both with the absence of any such allegation in the Superseding Indictment, and with a June 16, 2016 letter in which the government disclosed that "Appel did not think anyone was out to harm Crash Line and believed they were trying to avoid a picket." *See* **Exhibit C** (relevant excerpt of 6/16/16 letter) at 5, ¶ G.

In sum, taking the Superseding Indictment and the Bill of Particulars together, there is no allegation that the defendants sought or obtained any money from Company A; that the defendants threatened to do or not do anything to Company A; or that Company A's principals believed that the defendants intended to or would cause harm to Company A.

## ARGUMENT

Defendants now jointly move to dismiss the Superseding Indictment for failure to set forth a violation of the Hobbs Act as a matter of law. Federal Rule of Criminal Procedure 12(b)(3) permits the Court to dismiss an indictment for failure to state an offense. In ruling on a motion to dismiss, the Court must take as true the factual allegations set forth in the indictment. *See United States v. Guerrier*, 669 F.3d 1 (1st Cir. 2011). At the same time, it is not enough for an indictment to simply parrot the language of the statute at issue; an indictment "should lay out the elements of the charge and the factual circumstances underlying them." *United States v.*

*Elliott*, 689 F.2d 178, 180 (10th Cir. 1982). An indictment that fails to do so is subject to dismissal.

## I. <u>The Superseding Indictment Fails to Allege Facts Supporting a Hobbs Act Prosecution for the Wrongful Use of Economic Fear</u>

In relevant part, the Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Thus, to satisfy the elements of extortion, a defendant must both "obtain[] the property of another" and engage in one of the "three species of inducement which can lead to extortionate interference with interstate commerce: wrongful use of actual or threatened force or violence; the color of official right; and fear, which in practice – when unassociated with force, violence or misuse of public office – has come generally to mean fear of economic harm." *United States v. Sturm*, 671 F. Supp. 79, 83 (D. Mass. 1987) (*rev. in part on other grounds*, 870 F.2d 769 (1st Cir. 1989)).

The Superseding Indictment charges the defendants with the third category of inducement – that is, "the wrongful use of fear of economic harm." *See* Sup. Ind. ¶¶ 20, 21.[3] The First Circuit has long recognized that "there is nothing inherently wrongful about the use of economic fear to obtain property," as opposed to the use of threatened force or violence. *Sanchez et al v. Triple-S Management Corp. et al*, 492 F.3d 1, 12 (1st Cir. 2007) (*quoting Sturm*, 870 F.3d at 773). "Indeed, the fear of economic loss is a driving force of our economy that plays an important role in many legitimate transactions." *George Lussier Enterprises, Inc. et al v. Subaru of New England, Inc.*, 393 F.3d 36, 50 (1st Cir. 2004). For this reason, in order to establish the wrongful use of fear of economic harm, the government must allege not only that the defendants made a "demand" for Company A's property in the form of a threat, but also that

[3] As set forth in Part III, *infra.*, any attempt to charge defendants with the other two inducement categories would also fail as a matter of law.

Company A "had a pre-existing statutory right to be free from the defendant[s]' demand." *Id.*; *see also Natale v. Espy Corp.*, 2 F. Supp. 3d 93, 101 (D. Mass. 2014). This requirement of a threat is in addition to the separate requirement that the government allege the defendants actually obtained or attempted or conspired to obtain Company A's property. *See* 18 U.S.C. § 1951(b)(2). As set forth below, the Court should dismiss this case because the Superseding Indictment as informed by the Bill of Particulars utterly fails to allege these key elements of a Hobbs Act prosecution. *Compare New England Enterprises, Inc. v. U.S.*, 400 F.2d 58, 63 (1st Cir. 1968) (reading indictment and bill of particulars together to determine whether defendants were given adequate notice of charges against them).

### A. The Superseding Indictment Does Not Allege that the Defendants Obtained or Attempted to Obtain the Property of Company A

In the Bill of Particulars, the government stated that the property alleged to be at issue in this case consists solely of the wages and benefits paid by Company A to nine union workers for three days of work in September 2014. There is no allegation that the defendants themselves obtained or sought to obtain those wages, and there is no factual basis for such an allegation. Rather, it is undisputed that neither defendant sought or acquired any money in the course of this alleged extortion.

The U.S. Supreme Court recently reiterated that the "obtaining of property from another" element as used in the Hobbs Act "requires not only the deprivation but also the acquisition of property." *See Sekhar v. United States*, 133 S. Ct. 2720, 2725 (2013). In *Sekhar*, the defendant was indicted for attempted Hobbs Act extortion arising out of a series of anonymous emails he sent demanding that the New York State Comptroller's general counsel recommend investing pension money in a particular fund managed by defendant and threatening to disclose counsel's extramarital affair if he did not do so. *Id.* at 2723. The jury convicted the defendant and, on a

special verdict form, found that the "property" at issue consisted of "the General Counsel's recommendation to approve the" investment that was the subject of defendant's demands. *Id.* at 2724.

The Supreme Court vacated the defendant's conviction, holding that "[w]hether viewed from the standpoint of the common law, the text and genesis of the statute at issue here, or the jurisprudence of this Court's prior cases, what was charged in this case was not extortion." *Id.* The Court began by noting that extortion, "one of the oldest crimes in our legal tradition," traditionally "required the obtaining of items of value, typically cash, from the victim" – a tradition that was incorporated into the plain language of the Hobbs Act. *Id.* at 2724-25. The Court further noted that "obtaining property" within the meaning of the Hobbs Act "requires not only the deprivation but also the acquisition of property. That is, it requires that the victim 'part with' his property, and that the extortionist 'gain possession' of it." *Id.* at 2725 (citations omitted). The Court explained that this focus on "the criminal acquisition of property" was what historically distinguished extortion from the crime of coercion, an offense that involves "merely the use of threats to compel another person to do or abstain from doing an act which such other person has a legal right to do or abstain from doing," and one that Congress excluded from the Hobbs Act's reach. *Id.* The Court reversed the defendant's conviction because the government's theory "would not only make nonsense of words; it would collapse the longstanding distinction between extortion and coercion and ignore Congress' choice to penalize one but not the other." *Id.* at 2727.

The Court's holding in *Sekhar* was not new; courts have routinely read the plain language of the Hobbs Act to require that the defendant acquire or attempt to acquire the property that is the subject of the extortion. Ten years before *Sekhar*, for example, the Supreme Court found that

interfering with access to abortion clinics did not constitute "obtaining the property of another" under the Hobbs Act:

> Petitioners may have deprived or sought to deprive respondents of their alleged property right of exclusive control of their business assets, but they did not acquire any such property. Petitioners neither pursued nor received something of value from respondents that they could exercise, transfer, or sell. To conclude that such actions constituted extortion would effectively discard the statutory requirement that property must be obtained from another, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion.

*Scheidler v. NOW, Inc.*, 537 U.S. 393, 404-05 (2003); *see also James v. U.S.*, 550 U.S. 192, 220 (2007) (Scalia, J., dissenting) (noting that "the Hobbs Act retained the common-law requirement that something of value actually be *acquired* by the extortionist") (emphasis in original); *Mendez Internet Management Services, Inc. et al v. Banco Santander de Puerto Rico et al*, 621 F.3d 10, 15 (1st Cir. 2010) (affirming dismissal of complaint because allegation that defendant banks closed or refused to open accounts for plaintiff "betrays a misunderstanding of 'obtain' [under the Hobbs Act] . . . [D]isrupting or attempting to close a business is not an attempt to obtain that business"); *United States v. Gotti*, 459 F.3d 296, 300, 324-25 (2d Cir. 2006) (Hobbs Act requires "a showing that the defendant did not merely seek to deprive the victim of the property right in question, but also sought to obtain that right for himself").[4] Indeed, defense counsel is unaware of <u>any</u> Hobbs Act case that did not at least allege that the defendant intended to enrich himself through his extortionate conduct. *Cf. United States v. Perry*, 37 F. Supp. 3d 546, 554-55 (D. Mass. 2014) (denying motion to dismiss indictment where "the government alleges that

[4] For purposes of this analysis, it is irrelevant that some Hobbs Act cases arise in the civil context while others arise via a criminal prosecution because "courts should interpret the same language in the same section of the same statute uniformly, regardless of whether the impetus for interpretation is criminal or civil." *United States v. Nippon Paper Indus. Co., Ltd.*, 109 F.3d 1, 4 (1st Cir. 1997).

Defendants deprived union members of voting rights and used them for themselves to further their personal gain").[5]

The legislative history of 18 U.S.C. §1951 makes clear that conduct of the sort alleged in this case is not prohibited by the statute. The original statute began as "An Act to protect trade and commerce against interference by violence, threats, coercion or intimidation," 48 Stat. 979 (1934). The bill which led to its enactment, S. 2248, contained two paragraphs that might have supported charges such as those brought here. They read:

> The bill S. 2248 to protect trade and commerce against interference by violence, threats, coercion or intimidation, was read twice by its title, referred to the Committee on the Judiciary, and ordered to be printed in the RECORD, as follows:
>
> . . .
>
> (3) coerces or attempts to coerce any person, firm, association, or corporation to join or not to join an association, firm, corporation, or group, or to buy or rent commodities or services from particular sources, persons, firms or corporations or to make payments directly or indirectly to any person, association, firm, corporation, or group except for a bona fide consideration; or
>
> (4) coerces or attempts to coerce any person, firm, association or corporation to do an act which such person, firm, association or corporation has a legal right not to do, or to abstain from doing an act which such person, firm, association, or corporation has a legal right to do …

73 Cong. Rec. – Senate 458 (73rd Congress, 2d Session, 1934).

After the Senate passed that bill unanimously, representatives of the American Federation of Labor expressed concern that the law could discriminate against labor and that labor had not been heard in Committee, prompting a request for reconsideration. 73 Cong. Rec. – Senate 5859 (73 Congress, 2d Session, 1934). As the bill moved through the Congress, the Attorney General of the United States conferred with organized labor representatives and "straightened" the

[5] A number of issues arising from the *Perry* case are currently pending before the First Circuit *sub nom United States v. Burhoe et al*, docket no. 15-1542**.**

measure, 73rd Cong. Rec. – House 10867 (73d Congress, 2d Session, 1934). Paragraphs 3 and 4 cited above were deleted in their entirety and with that, explicit language related to coercing the use of services by unions disappeared, replaced by language precluding application of the law to the payment of wages by a bona fide employer to a bona fide employee. 73rd Cong. Rec. – Senate 11482 (73d Congress, 2d Session, 1934). The straightened language appeared in section 2 of the 1934 enactment and is set forth in full at **Exhibit D**.

The rejected language never reappeared. The substitute language, however, soon generated controversy, resulting in Congressman Hobbs' amendment that gave §1951 its common name. The "Hobbs bill" was passed in 1946 in response to the Supreme Court's decision in *United States v. Local 807*, 315 U.S. 521 (1942), in which a divided court construed "that portion of §2(a) which excepts from punishment any person who "obtains or attempts to obtain, by the use of or attempt to use or 'threat to use force, violence or coercion… the payment of wages by a bona fide employer to a bona fide employee.'" *Id.* at 527. It held that the "payment of wages" exclusion insulated members of a local union from prosecution under the act even though the evidence showed they had used force, violence, coercion and threats to obtain money from "over the road" truck companies for each truck going into New York City, charging a per truck exaction of regular union rates for a full day of work regardless of whether any additional work was actually performed. *Id.* at 526. The Court looked to the legislative history and found that "elimination of terroristic activities by professional gangsters was the aim of the statute," and that "no interference with traditional labor union activities was intended." *Id.* at 530. The Court further found that Congress intended the statute to "leave unaffected the ordinary activities of labor unions," such as attempts to secure wages for "standby" jobs, as opposed to "the activities of predatory gangs of the Kelly and Dillinger types." *Id.* at 535-536.

The Court specifically rejected the government's contention that the crucial issue was whether the money was paid for protection as opposed to labor, disagreeing with the proposition that the state of mind of the truck owners was decisive as to guilt. *Id.* at 532.

Congressman Hobbs' bill was a reaction to the *Local 807* decision. It did not, however, change the fact that the law was not intended to "interfere with the rights of unions in carrying out their legitimate objectives," including the right to take "legitimate and peaceful concerted action." See House Document No. 690 (79th Congress, 2d Session) (Message from the President of the United States (July 3, 1946) explaining his reasons for signing 60 Stat. 420 into law. *See* **Exhibit E**. Ten years later, in *United States v. Green*, 350 U.S. 415, 419 (1956), the Supreme Court confirmed that a key feature of the Hobbs Act was its elimination of the exclusion clause involved in the *Local 807* decision, and that the deletion "was meant to eliminate any grounds for future judicial conclusions that Congress did not intend to cover the employer-employee relationship." *Id.* [6]

The Hobbs Act defined the word "extortion" without reference to "coercion" (consistent with the prior Act), and also eliminated "coercion" from the definition of "robbery." The significance of that alteration is reflected in *Sekhar*:

---

[6] Prior to *Scheidler* and *Sekhar*, some courts cited *Green* for the broad principle that "extortion as defined in the [Hobbs Act] in no way depends upon having a direct benefit conferred on the person who obtains the property." *See, e.g., United States v. Provenzano*, 334 F.2d 679 (3d Cir. 1964) (*citing Green*, 350 U.S. at 420). While perhaps true in theory, that principle is inapposite to the issue raised by this Motion. As explained above, *Green* was not about whether the defendants (a union and union representative) attempted to obtain the property at issue; there was no question that they did. Rather, *Green* addressed defendants' argument that "union efforts to secure 'made work' [i.e., fictitious jobs] for their members were not unfair labor practices" and therefore fell outside of the Hobbs Act, which they read to proscribe only "the taking of property from another for the extortioner's personal advantage." *See Green*, 350 U.S. at 418 (emphasis added). In contrast, the defendants in this case are not alleged to have obtained or attempted to obtain the property at issue at all, much less any other benefit – a fact that distinguishes this case from *Green* and all other Hobbs Act prosecutions of which defendants are aware. *See, e.g., Provenzano*, 334 F.3d at 682, 684-86 (defendant personally received payoffs from victim and also instructed victim to pay monthly "retainer" to attorney whom defendant knew); *see also United States v. McDonough*, 727 F.3d 143, 161-62 (1st Cir. 2013) (court need not reach issue of whether some "benefit" is necessary because payments at issue either benefited defendant directly or the jury found they were given to third parties for his benefit).

> The Act was modeled after § 850 of the New York Penal Law (1909), which was derived from the famous Field Code, a 19th-century model penal code, see 4 Commissioners of the Code, Penal Code of the State of New York § 613, p. 220 (1865) (reprint 1998). Congress borrowed, nearly verbatim, the New York statute's definition of extortion. *See Scheidler*, 537 U.S., at 403, 123 S.Ct. 1057. The New York statute contained, in addition to the felony crime of extortion, a new (that is to say, nonexistent at common law) misdemeanor crime of coercion. Whereas the former required, as we have said, "the criminal acquisition of ... property," *ibid.*, the latter required merely the use of threats "to compel another person to do or to abstain from doing an act which such other such person has a legal right to do or to abstain from doing." N.Y. Penal Law § 530 (1909), earlier codified in N.Y. Penal Code § 653 (1881). Congress did not copy the coercion provision. The omission must have been deliberate, since it was perfectly clear that extortion did not include coercion. At the time of the borrowing (1946), New York courts had consistently held that the sort of interference with rights that occurred here was coercion. *See, e.g., People v. Ginsberg*, 262 N.Y. 556, 188 N.E. 62 (1933) (per curiam) (compelling store owner to become a member of a trade association and to remove advertisements); *People v. Scotti*, 266 N.Y. 480, 195 N.E. 162 (1934) (compelling victim to enter into agreement with union); *People v. Kaplan*, 240 App.Div. 72, 74–75, 269 N.Y.S. 161, 163–164, aff'd, 264 N.Y. 675, 191 N.E. 621 (1934) (compelling union members to drop lawsuits against union leadership).

Id. at 2725-2726.

As in *Sekhar*, this indictment charges extortion, not misdemeanor coercion under turn-of-the-century New York penal law, but fails to allege sufficient facts to satisfy the elements of the charged crime. Allowing this case to proceed "would not only make nonsense of the words; it would also collapse the longstanding distinction between extortion and coercion and Congress's decision to penalize one and not the other." *Sekhar* at 2727.

In sum, neither defendant is alleged to have obtained or attempted to obtain any of the wages that constitute the property at issue in this case. To the contrary, in the Bill of Particulars, the government made clear that the wages at issue were paid to third-party union members, each of whom actually performed work in exchange for the wages and none of whom are alleged to have conspired with the defendants.[7] The government's theory may well be that the defendants

[7] The Superseding Indictment also fails to allege that Company A paid for "fictitious" services. *Compare* Sup. Ind. ¶¶ 19, 20 (alleging payment for "imposed, unwanted, and unnecessary and superfluous services") *with Green*, 350 U.S. at 417 (alleging payment for "imposed, unwanted, superfluous, and fictitious services"); *accord Enmons*, 410

interfered with Company A's right not to pay those wages – a theory the defendants vigorously contest – but even taking all of the allegations as true for purposes of this Motion, the Superseding Indictment omits any allegation that the defendants themselves acquired or attempted to acquire the property at issue and thereby omits an essential element of the charged crime. For this reason alone, the Court should dismiss the charges against the defendants.

### B. The Superseding Indictment Does Not Allege an Extortionate Demand or Threat

The Superseding Indictment also fails to allege a second essential element of the charged crime – that is, that the defendants actually threatened to do or refrain from doing something unless Company A acceded to their alleged demands to hire union workers.

Under the Bill of Particulars submitted by the government, the only arguable "threat" the defendants allegedly made was to "convey[] that if [Local 11] was not hired, [Local 11] would picket and come with the blow up rat, which would be a problem for both [Company A] and the mayor." *See* Exhibit A at 1-2, ¶ 4. In other words, even assuming the allegations are true, the defendants themselves did not threaten to do or not do anything. Rather, all the defendants are alleged to have done is inform Company A's principals that if Company A did not hire a third party union's workers, that union would picket Company A's event.

These allegations fall far short of the mark of a viable Hobbs Act prosecution. At the most basic level, extortion necessarily requires a defendant to make a threat to obtain something of value. Here, however, the defendants are not alleged to have threatened to do anything to Company A (or anyone else). Even taking all of the allegations as true, at best they show that

U.S. at 400 (Hobbs Act reaches "payments from employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers" but does not proscribe even "the use of violence to achieve legitimate union objectives, such as higher wages in return for genuine services which the employer seeks"). This issue is also before the First Circuit in *United States v. Burhoe*, docket no. 15-1542, and defendants reserve the right to raise it as an additional defect in the Superseding Indictment following the decision in that case.

the defendants communicated what an unrelated third party might do. That is a far cry from prior Hobbs Act cases in this and other circuits.

Even if one could fairly characterize the alleged conduct set forth in the Bill of Particulars as constituting a "threat" of economic harm, "the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions." *George Lussier Enterprises, Inc.*, 393 F.3d at 50. As explained by another court in this District, conduct "designed to instill anxiety that some economic benefit or interest may be lost . . . is after all the animating force of our economic system. Consequently, the concept of wrongful inducement of fear of economic harm requires a careful effort at definition lest the push and shove of the market place lead capriciously to criminal sanction." *Sturm*, 671 F. Supp. at 84. For this reason, the First Circuit has developed an important gate-keeping test: "economic fear is wrongful under the Hobbs Act [only] if the plaintiff had a pre-existing statutory right to be free from the defendant's demand." *Id.*; *Sanchez*, 492 F.3d at 12; *George Lussier Enterprises*, 393 F.3d at 50; *see also Natale*, 2 F. Supp. 2d at 101 (D. Mass. 2014) (dismissing extortion claims where plaintiff cannot "show that Defendants employed any 'threats' to obtain something from her. Indeed, [plaintiff] fails even to allege what Defendants were purportedly attempting to gain.").

Applying that test to these allegations, the Superseding Indictment fails to state a viable Hobbs Act charge. There is no statutory right to avoid being peacefully picketed by an aggrieved union; to the contrary, the right to picket has been a protected union activity under the Fair Labor Standards Act for nearly 80 years. 29 U.S.C. § 157; *accord Division 1287 of Amalgamated Ass'n of St. Elec. Ry. and Motor Coach Emp. Of America v. Missouri*, 374 U.S. 74, 82 (1963) ("Collective bargaining, with the right to strike at its core, is the essence of the

federal scheme."); *United States v. Enmons*, 410 U.S. 396, 400 (1973) (finding that even the "use of violence to achieve legitimate union objectives" is not prohibited by the Hobbs Act); 18 U.S.C. § 1951(c) ("This section shall not be construed to repeal, modify or affect . . . sections 52, 101-115, 151-166 of Title 29").

In *United States v. Gibson*, 726 F.2d 869, 872 (1st Cir. 1984), the court considered the defendant's argument that his Hobbs Act conviction should be reversed because the "problem" he was trying to avoid was a picket, and the court acknowledged that even violence during picketing falls outside of the Hobbs Act's proscriptions. Unfortunately for that defendant, the evidence at trial showed that the "problem" defendant was offering to solve was the violence he impliedly threatened would ensue if he did not receive a personal payoff. *See id.* ("Defendant's language certainly does not convey the message that the problem to be solved was picketing."). In marked contrast, here, a potential picket is the only "problem" that the defendants are alleged to have discussed with Company A. *See* Exhibit A at 1-2, ¶ 4. That, plus the absence of any alleged attempt to receive a personal payoff or hint of potential violence, fundamentally distinguishes this case from *Gibson* or any other Hobbs Act prosecution.

In sum, the only potential issue allegedly discussed by the defendants was the "threat" of a lawful picket, which under these allegations is not an extortionate threat as a matter of law. *Accord George Lussier Enterprises*, 393 F.3d at 51 (defendant's "conditioning of access to cars to which dealers had no pre-existing entitlement represents lawful hard-bargaining, not unlawful extortion"). For these reasons as well, the Superseding Indictment fails to allege an essential element of the charged crime.

**C. Even If the Superseding Indictment Alleged that Defendants Threatened to Withhold Permits from Company A (Which It Does Not), It Would Still Fail to Set Forth Sufficient Allegations to Constitute a Violation of the Hobbs Act as a Matter of Law**

The absence of any alleged permit-related threats in both the Superseding Indictment and the Bill of Particulars forecloses the government from insinuating that the defendants somehow nonetheless conditioned the issuance of Company A's permits on its consent to hire nine union workers. While the First Circuit has "agreed that a threat need not be explicit to be extortionate," *Sanchez*, 492 F.3d at 13, even an implicit threat must be communicated. As explained in *Sanchez*, "a rock thrown through a window can be just as effective as a threatening letter in convincing the victim to relinquish his property. This is the lesson of the cases, on which plaintiffs heavily rely, that upheld extortion convictions based on implied threats." *Id.* Here, the defendants are not alleged to have communicated anything, explicitly or implicitly, about permits. Rightfully so, given the government's disclosure that "there was no mention of permitting by Brissette or Sullivan" in any conversations with Company A prior to the September 2014 event. *See* Exhibit C at 5, ¶ G.

Even if the Superseding Indictment had alleged "implicit" permit-related threats, it would still fail the First Circuit's gate-keeping test because there is no pre-existing statutory right to obtain a permit to use public property without conditions, including conditions that the permittee employ certain workers. As more fully set forth in the Supplemental Memorandum in Support of Joint Motion to Dismiss, the City of Boston has broad discretion to set and oversee the terms of a license to use its property in the same manner as a private owner so long as the City is acting as a "proprietor" and not a "regulator." *See* Supp. Mem. at Part II; *see also* City of Boston Code, § 17-13.3 ("The Mayor may impose conditions upon a license . . . relate[d] to . . . steps required to be taken to guard against creation of a nuisance or to insure adequate safety and security for

patrons of the affected public."); *see also Building & Constr. Trades Council of Metro. Dist. v. Assoc. Bldr's & Contract'rs of Mass./R.I., Inc. et al*, 507 U.S. 218, 232 (1993) (a state "may manage its own property when it pursues purely proprietary interests, and where analogous private conduct would be permitted"). This is true even if the terms imposed relate to the use of union labor. In *Building & Constr. Trades Council*, for example, the Supreme Court affirmed the right of the Massachusetts Water Resource Authority to insist that non-union contractors bidding on a particular project be subject to a separate collective bargaining agreement that was designed "to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost" and which included, among other requirements, an obligation "compelling" certain employees of the contractors to join the union. *Id.* at 221-22, 231-32; *see also Callahan v. City of Malden*, 430 Mass. 124 (1999) (municipality could require use of a project-specific labor agreement consistent with state procurement laws because the agreement advanced the underlying purposes of the bidding statue to save the municipality money and allow it to complete work on time).

The City of Boston is well within its proprietary rights to impose reasonable requirements on leasees – including conditions requiring the use of union labor. Because as a matter of law Company A was <u>not</u> statutorily entitled to receive a permit to use City of Boston property free from any such condition, the Superseding Indictment cannot satisfy the threshold requirement for alleging Hobbs Act extortion through the "wrongful" use of fear of economic harm as a matter of law. *Accord George Lussier Enterprises*, 393 F.3d at 51.

### D. The Superseding Indictment Fails to Allege Facts Sufficient to Find Fear on the Part of the Purported Victim as a Matter of Law

Finally, the Superseding Indictment fails to allege that Company A was actually placed in fear of economic harm by the defendants or that any such fear was reasonable. *See, e.g., Sturm*,

671 F. Supp. at 90 (Hobbs Act prosecution based on wrongful use of fear of economic harm must include proof that defendant's conduct "could reasonably have induced fear in the victim"). Taken as true for purposes of this Motion, the Bill of Particulars establishes only that (1) defendants told Company A that half of their crew had to be union members to avoid a picket, (2) Company A responded that hiring that amount of union members would cripple them financially, and (3) the parties thereafter "negotiated" an agreement that Company A would hire eight union members. *See* Exhibit A at 1-2, ¶ 4. Far from alleging that Company A acceded to the defendants' extortionate demands out of fear, the alleged conduct demonstrates nothing more than a good faith attempt to come to some compromise that would satisfy all interests involved. These allegations combined with the government's disclosure that Company A's representative "did not think anyone was out to harm [Company A] and believed that they were trying to avoid a picket" further demonstrate the failure of the Superseding Indictment to plead a viable Hobbs Act violation.

## II. <u>The Hobbs Act As Applied in this Case Is Unconstitutional Under the Fifth Amendment</u>

The government's position that these defendants committed Hobbs Act extortion despite the lack of any alleged threats, or any attempt to obtain money, or even an allegation that the purported victim was placed in fear by their conduct, renders the Act unconstitutionally vague. The Fifth Amendment prohibits the government from "taking away someone's life, liberty or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. U.S.*, 135 S. Ct. 2551, 2556 (2015) (citations omitted); *see also Butler v. O'Brien*, 663 F.3d 514, 518 (1st Cir. 2011); *Precious Metals Assoc., Inc. v. Commod. Fut. Trading Comm'n*, 620 F.2d 900, 906 (1st Cir. 1980). "The touchstone is whether the statute, either standing alone or as construed,

made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267.

Here, the defendants are charged with violating the Hobbs Act despite the fact that they (1) did not obtain any property from the purported victim; (2) did not threaten to do or refrain from doing anything to the purported victim; and (3) did not actually place the purported victim in fear. Each of the missing pieces goes to the heart of how the statute and the courts differentiate perfectly legitimate conduct from criminal extortion; their combined absence renders the statute's potential application limitless.

The Supreme Court has consistently warned against expansively reading the Hobbs Act, most recently in *McDonnell v. U.S.*, 136 S.Ct. 2355 (2016). *McDonnell* addressed an overly expansive reading of the Hobbs Act in the context of an "under color of right" prosecution involving large amounts of extravagant gifts – as opposed to this "fear of economic harm" case involving not one dime going to either defendant – but the chilling effect of the government's "breathtaking expansion of public-corruption law" on the ability of public officials to "hear from their constituents and act appropriately on their concerns" applies equally here.[8] *Id.* at 2372 (noting that, were the Court to accept the government's expansive reading, "[o]fficials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse"). Here, all the defendants allegedly did was to speak with, and try to resolve a potential dispute between, two groups of constituents – without threats, without payoffs, and without instilling fear in anyone. Prior to this prosecution, no reasonable person would have thought that could

[8] Notably, the government could not have charged either defendant with Hobbs Act extortion committed "under color of official right" for several reasons, including that neither defendant received any payment from anyone or took an "official act" in exchange for any such payment. *See also McDonnell*, 136 S.Ct. at 2370 ("hosting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a 'decision or action'" sufficient to establish Hobbs Act extortion "under color of official action").

possibly constitute a federal crime. *Accord id.* ("conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time").

Equally troubling, the government's expansive reading fails to provide any protection against "arbitrary and discriminatory enforcement." *Skilling v. U.S.*, 561 U.S. 358, 402-403 (2010). Federal prosecutors ought not to be in the business of "setting standards of good government for local and state officials" – particularly not where their theories require the unprecedented expansion of law in order to be even potentially viable. *McDonnell*, 579 U.S. at 24 (citations and internal punctuation omitted); *see also United States v. Taveres*, 844 F.3d 46, 54 (1st Cir. 2016) (dismissing indictment where government "overstepped its bounds in using federal criminal statutes" to prosecute state employees). Here, the Superseding Indictment fails to allege even the basic contours of the charged crime. At this point, after the government was given the opportunity to correct the indictment's flaws through a Bill of Particulars and failed to do so, dismissal is the only appropriate response.

**CONCLUSION**

For the foregoing reasons, defendants jointly request that the Court grant their motion and dismiss the Superseding Indictment against them.

Respectfully submitted,
KENNETH BRISSETTE,
By his attorneys,

*<u>/s/ William H. Kettlewell</u>*____________
William H. Kettlewell (BBO # 270320)
Sara E. Silva (BBO # 645293)
COLLORA LLP
100 High Street, 20th Floor
Boston, MA 02110
(617) 371-1000
(617) 371-1037 (fax)
wkettlewell@collorallp.com

ssilva@collorallp.com

TIMOTHY SULLIVAN,
By his attorneys,

/s/ *William J. Cintolo*
*/s/ Thomas R. Kiley*

William J. Cintolo (BBO # 084120)
Thomas R. Kiley (BBO # 271460)
COSGROVE EISENBERG & KILEY
One International Place, Suite 1820
Boston, MA 02110
617.439.7775 (tel)
617.330.8774 (fax)
wcintolo@ceklaw.net

Dated: January 24, 2017

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on January 24, 2017.

*/s/ William H. Kettlewell*